Peter BISHOP

v.

**The FIRESTONE TIRE & RUBBER COMPANY, The Budd Company, A.M.F. Corporation.**

**No. S 83–144.**

United States District Court,
N.D. Indiana,
Hammond Division at Lafayette.

Sept. 2, 1983.

John C. Risjord, Danny L. Curtis, Kansas City, Mo., Henry E. Bradshaw, Indianapolis, Ind., Dick N. Bishop, Flora, Ind., for plaintiffs.

Richard D. Wagner, Anthony W. Mommer, Indianapolis, Ind., Joseph T. Bumbleburg, Lafayette, Ind., Thomas J. Wheatley, Brian N. Woolley, Thomas P. Schult, Kansis City, Mo., Frank S. Perkin, Jr., Troy, Mich., J. Frederick Hoffman, Lafayette, Ind., Joseph A. Sherman, Kansas City, Mo., Larry R. Fisher, Lafayette, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The complaint in this case was originally filed in the Western District of Missouri on July 17, 1980, and was subject to multi-district proceedings before it was docketed in the South Bend Division of this court on April 1, 1983. The proper venue of this case is in the Hammond Division at Lafayette. This case is carried on the docket of that court in accord with the order of this court entered April 14, 1983.

Jurisdiction here is based on 28 U.S.C. § 1332 and the substantive law of Indiana applies. This includes the statute of limitations provided for in the State of Indiana.

The defendants, The Budd Company and The Firestone Tire and Rubber Company, have each filed motions for summary judgment under F.R.Civ.P. 56. An evidentiary hearing thereon was held in Lafayette, Indiana, on July 8, 1983, and the issues have now been fully briefed.

Although the factual context is slightly different as to each defendant, the sole legal issue presented is the same. This court must determine in the context of Rule 56 motions whether to apply the limitations provisions of Ind.Code § 33–1–1.5–5.

Ind.Code Ann. § 34–4–20A–5 (Burns 1982 Supp.) [1] provides,

> This section applies to all persons regardless of minority or legal disability. Notwithstanding IC 34–1–2–5, any product liability action must be commenced within two [2] years after the cause of action accrues or within ten [10] years after the delivery of the product to the initial user or consumer; except that, if the cause of action accrues more than eight [8] years but not more than ten [10] years after that initial delivery, the action may be commenced at any time within two [2] years after the cause of action accrues.

It is beyond dispute that the statute of limitations question can, under Indiana law, be raised on a Rule 56 motion. *Horvath v. Davidson*, 148 Ind.App. 203, 264 N.E.2d 328 (1970). It is also beyond dispute that Indiana now adheres to the rule of *lex loci delicti. Bowen v. United States*, 570 F.2d 1311 (7th Cir.1978); see also, *Witherspoon v. Salm*, 251 Ind. 575, 243 N.E.2d 876 (1969).

In order to decide these motions for summary judgment it is necessary to apply the federal summary judgment law under Rule 56. This court is also well aware that the

---

1. Ind.Code § 33–1–1.5–1 *et seq.* was enacted by § 28 of 1978, P.L. 141 as chapter 1.5 of article 1 of Title 33 of the Indiana Code. The compilers of this statute transferred it to Ind.Code Ann. § 34–4–20A–1 *et seq.* (Burns), because it deals with products liability claims.

comparable Indiana Trial Rule and the case law thereunder are to the same effect as F.R.Civ.P. 56. See, *Wozniczka v. McKean*, 144 Ind.App. 471, 247 N.E.2d 215 (1969).

Rule 56(e) imposes the burden upon a party opposing a motion for summary judgment to respond to the movants' presentations by setting forth specific facts indicating the existence of a genuine issue of material fact for trial on the merits. *Markwell v. General Tire & Rubber Co.*, 367 F.2d 748 (7th Cir.1966). See also 10A Wright, Miller and Kane, Federal Practice and Procedure § 2739 at n. 5 (1983 ed.). The Supreme Court of the United States has held that evidence must be "significant" and "probative." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Weit v. Continental Illinois National Bank & Trust Company of Chicago*, 641 F.2d 457 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982). 6 Moore's Federal Practice, § 56.15(3) at 486–87 states the applicable standard as follows: "[T]he opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectual, speculative, nor merely suspicious." It is now necessary to treat each defendant's motion for summary judgment separately.

## I. BUDD MOTION

The plaintiff alleges that he was injured on August 9, 1978 when a multi-piece rim assembly explosively separated while he was inflating the assembly. The components of the multi-piece rim are a rim base manufactured in November of 1948 by the Cleveland Welding Company, formerly a division of defendant, A.M.F. Corporation, (hereinafter referred to as A.M.F.), and a side ring manufactured in 1941 by defendant, Firestone Tire and Rubber Company, (hereinafter referred to as Firestone). The defendant, The Budd Company, did not manufacture either component. Cleveland Welding Company was purchased by A.M.F. in 1951. The Budd Company purchased certain assets of A.M.F., Cleveland Welding Division in 1960. The purchase involved the manufacturing line and other designated assets.

The evidentiary hearing of July 8, 1983, was limited to the question of the applicability of the Indiana Products Liability Statute of Limitations and evidence as to whether the 1948 rim base and 1941 ring were placed in the stream of commerce prior to August 9, 1968, which is ten years before the plaintiff's injury on August 9, 1978.

The only evidence submitted at the hearing with regard to the manufacture of the rim base and the placing of the rim base into the stream of commerce was that submitted by The Budd Company. The affidavits of Charles Janosek and John G. Janosek are undisputed. Charles Janosek began his employment with the Cleveland Welding Company in 1924 and became factory manager in charge of all operations in 1945 and continued in that capacity until 1961. In 1948 manufactured rims were shipped by truck to customers. Mr. Janosek states that "any rim manufactured in 1948 would have been shipped to a customer long before 1961 so that if any inventory was sold to The Budd Company in 1961, that inventory would have included only parts manufactured while Cleveland Welding was a division of A.M.F. Incorporated."

The affidavit of John G. Janosek shows that he started his employment with Cleveland Welding Company in 1933. He worked in various departments and was familiar with the rim base department and their procedures in 1948 and 1949. Mr. Janosek was familiar with the demand for rim bases, and the manufacture, storing, shipment and handling by Cleveland Welding. There was a great demand because of the shortage of steel in 1948 and 1949. Most of the rim bases were loaded directly into trucks and boxcars for direct shipment to customers rather than being stored. Any rim bases stored in the warehouse were stored only for a matter of months. In 1948 and 1949 the warehouse would be completely emptied of rim bases within a

matter of months. Rim bases were delivered to customers within three months and on the road within three to six months after manufacture. Mr. Janosek further stated in his affidavit that "there is no question that a rim base manufactured by Cleveland Welding Company bearing the date '11–48' would have been delivered to a customer and would have been being [sic] used on the road within a few months of November 1948."

In addition to the affidavits of Charles and John Janosek, The Budd Company introduced into evidence the deposition of William R. McElhiney. The entire deposition was introduced into evidence. William R. McElhiney is currently the owner and President of The Ness Company. He started his employment with The Ness Company in 1943. The Budd Company is presently a competitor of The Ness Company. During the years 1948 to 1950, Cleveland Welding Company did not have an inventory of rims including twenty by seven-fifty rims. In response to a question of when a twenty by seven-fifty rim manufactured in November 1948 would have reached its initial purchaser, Mr. McElhiney stated:

I would say it would almost still be warm when it left the plant because they were coming right off the line going onto trucks to be delivered.

The Budd Company did not continue to produce rims designated as Cleveland Welding Rims after it purchased the Cleveland Welding assets. The Budd Company did not manufacture rims at the Cleveland location.

In addition to the affidavits and deposition, The Budd Company introduced into evidence a Certificate of the Office of the Secretary of State of Indiana with regard to The Budd Company's admission in Indiana starting January 30, 1950 and continuing through November 19, 1982, the date of the certificate. There was an agent for service of process for a period exceeding twenty-two years which included the time of the accident and the time of the filing of the complaint. The Certificate of the State of Indiana with regard to the admission of A.M.F. to do business in Indiana was for a period from May 6, 1957 to the date of the certificate. The affidavit of Frank S. Perkins, Jr. and the Agreement for Sale of Assets entered into between American Machinery and Foundry Company and The Budd Company was dated September 3, 1959. A certified copy of the order of July 23, 1982 granting in part and denying in part the motion of The Budd Company for partial summary judgment was also presented. There was also the Covenant Not to Sue executed by Peter Bishop to A.M.F. In addition, the rim and wheel assembly was made available in open court for inspection by the court and for use by any of the witnesses.

In the plaintiff's answer to supplemental interrogatories of The Budd Company, filed on February 22, 1983, the plaintiff stated that he had no knowledge when the subject component parts were placed in the stream of commerce.

The plaintiff in his response to the Second Request for Admission of The Budd Company, admitted that the Cleve-Weld rim base was manufactured in November of 1948 and that the Cleveland Welding Company ceased its manufacture of Cleve-Weld truck rims in 1960.

The plaintiff also admitted that Donald Gibson never purchased, as new, a Cleve-Weld rim base during the course of his involvement "in the study and evaluation of the manufacture and design of multi-piece rims produced by various manufactures." That neither of the wheel assemblies purchased by Donald Gibson and referred to in the Gibson affidavit was manufactured by Cleveland Welding Company.

In addition, the plaintiff admitted that he had no evidence concerning the sales or inventory practices of the Cleveland Welding Company for the period of 1948 to 1955 different from that set forth in the Janosek affidavits supplied by A.M.F. in support of its motion for summary judgment.

The plaintiff introduced into evidence the testimony of Donald Gibson. Mr. Gibson testified that the rim base and ring involved in this case were in good shape with

no severe corrosion or severe wear. In addition, he testified that the time base did not look like it had had continuous service for thirty years. Mr. Gibson had purchased one twenty-five year old brand new Firestone rim and RH–5 ring in Kansas City in 1980 from a Ford dealer. The rim base he purchased was not a Cleve-Weld rim. In addition, he testified that with regard to the rim and ring involved in this case he could not give a year and service date. They might have been in service twenty years with good care. They could have been in service fifteen years. The length of time in service or the physical condition of the wheel assembly, however, are not the issues in this case. The issue involves the placing of the rim base into the stream of commerce. Mr. Gibson gave no testimony on that issue and did not attempt to dispute the Janosek affidavits.

As noted above, the issue to be decided by this court is whether The Budd Company placed into the stream of commerce the rim base referred to in the plaintiff's complaint less than ten years prior to the date of the plaintiff's injury. The plaintiff presented no evidence on that issue. The plaintiff's conspiracy allegations have been stricken from this case by Judge Collinson while this case was still pending in multi-district proceedings in the Western District of Missouri. Such ruling constitutes a part of the law of this case.

This court is aware that such prior orders may, under certain conditions, be reviewed and vacated by a transferee court. See *In re The Upjohn Company Antibiotic Cleocin Product Liability Litigation,* 81 F.R.D. 482 (E.D.Mich.1979), *aff'd,* 664 F.2d 114 (6th Cir.1981). See also, *Meat Price Investigators Association v. Spencer Foods, Inc.,* 572 F.2d 163 (8th Cir.1978). Compare *In re Exterior Siding & Aluminum Coil Litigation,* 538 F.Supp. 45 (D.Minn.1982), and 696 F.2d 613 (8th Cir. 1982).

This court has not here been asked to disturb the rulings made before transfer and no appeal from same has been taken.

There is no reason apparent in this record to disturb those prior rulings.

■ The only evidence presented to this court with regard to The Budd Company shows that The Budd Company did not design, manufacture, sell or in any other way place into commerce the rim base or any part of the assembly which allegedly injured the plaintiff. The plaintiff described the multi-piece truck rim as it pertains to the rim base in his complaint as follows: "Rim Base-Cleve-Weld 20 × 7.50 – V/8.00 V, manufactured in November 1948." The plaintiff then alleged that the Cleve-Weld rim base was manufactured by the Cleveland Welding Company, a division of A.M.F. or by The Budd Company.

The plaintiff admitted in his Response for Request for Admissions that he had no evidence concerning the sales or inventory practices of the Cleveland Welding Company for the period 1948 to 1955 different from that set forth in the Janosek affidavits. As noted above, one of the items set forth in the affidavit of Charles Janosek is that any rim manufactured in 1948 would have been shipped to a customer long before 1961, so that if any inventory was sold to The Budd Company in 1961 that inventory would have included only parts manufactured while Cleveland Welding was a division of A.M.F. The evidence shows that at the time of the manufacture of the rim in question, Cleveland Welding Company was not a division of A.M.F.

The plaintiff abandoned his successor liability theory against The Budd Company. Any successor liability matters have been released by the plaintiff in the Release which he entered into and executed with A.M.F.

The plaintiff argues that the ten year statute of limitations provided in the Indiana Products Liability Act is not applicable to The Budd Company in this case because The Budd Company cannot prove the exact date that the rim base was placed in the stream of commerce or reached the user or consumer. The plaintiff admitted that he had no evidence to contradict the information contained in the Janosek affidavits.

The rim base involved in this case had been clearly stamped, Cleve-Weld. Charles Janosek stated without dispute that Cleveland Welding Company became a division of A.M.F. in 1951. After Cleveland Welding Company became a division of A.M.F. rims were stamped with the initials "CWD". Therefore a rim base stamped Cleve-Weld must have been manufactured prior to 1951. In addition, Charles Janosek stated that:

> Further, based upon my knowledge of the rim plant, the factor and the shipping of rims, any rim manufactured in 1948 would have been shipped to a customer long before 1961 so that if any inventory was sold to The Budd Company in 1961, that inventory would have included only parts manufactured while Cleveland Welding was a division of A.M.F. Incorporated.

Plaintiff admitted that he had no evidence to contradict this unequivocable statement of Charles Janosek.

The plaintiff attempts, in the briefs filed with this court, to encourage this court to limit the Indiana Products Liability Act to products which have a serial number and which can be clearly traced by invoices and serial number to the purchaser. Such is contrary to the intent of the Indiana Products Liability Act and any such restriction would completely abrogate the Act. The only evidence in this case is that the rim base was placed in the stream of commerce within a few months after its manufacture in November of 1948.

This court is familiar with Ind.Code § 33–1–1.5–5 which sets out a statute of repose for product liability actions. This court and the Supreme Court of Indiana have interpreted this statute to mean that the "action must be brought within two years after it accrues, but in any event within ten years after the product is first delivered to the initial user or consumer, unless the action accrues more than eight but less than ten years after the product's introduction into the stream of commerce." *Dague v. Piper Aircraft Corp.*, 513 F.Supp. 19, 24 (N.D.Ind.1980), *aff'd* by order 654 F.2d 727 (7th Cir.1981); *Dague v. Piper Aircraft Corp.*, Ind., 418 N.E.2d 207, 213 (1981).

There is no evidence in this case to contradict the Janosek affidavits showing that the 1948 rim base was placed into the stream of commerce within a few months after its manufacture in November of 1948. In addition, the evidence clearly shows that The Budd Company did not design, manufacture or sell the rim base which was involved in this incident.

Thus, the only evidence presented to this court leads solely to the conclusion that the Cleve-Weld rim base, manufactured in November of 1948, was placed in the stream of commerce and delivered to the initial user or consumer more than ten years prior to the occurrence of the accident in this case. The plaintiff has failed to make any presentation to the contrary. The Budd Company, which did not design, sell or manufacture the rim base, is clearly entitled to summary judgment. Such is now ordered to be entered at plaintiff's costs.

## II. FIRESTONE'S MOTION

### A.

The Firestone motion presents a close question.

At the July 8 hearing, Firestone first introduced into evidence its Exhibits 1 and 2. Firestone's Exhibit 1 is a certified copy of the order dated July 30, 1982, granting Firestone's motion to limit issues, entered by the United States District Court for the Western District of Missouri in the multi-district litigation proceedings affecting this action.

Firestone's Exhibit 2 is a certificate of the Secretary of State of the State of Indiana dated May 13, 1983, certifying that Firestone was admitted to do business in the State of Indiana continuously from July 9, 1938 through May 13, 1983, and is currently in good standing with the Secretary of State of Indiana. This certificate negates any contention that the running of the statute of limitation prescribed by Ind. Code § 33–1–1.5–5 (Statute) has been tolled

at any time pertinent to this action by reason of Firestone's status as a non-resident corporation. See *Dague v. Piper Aircraft Corp.*, 513 F.Supp. 19 (N.D.Ind.1980), *aff'd* by order, 654 F.2d 727 (7th Cir.1981).

Firestone called as a witness Harry Kuntz, an employee of Firestone. Mr. Kuntz began his employment with Firestone in 1953 as an accountant. From 1958 until 1965, he was an accountant in the Steel Products Company, a division of Firestone which makes and sells among other things multi-piece truck wheel rim assemblies and component parts. In 1965, the Data Processing Department of the Steel Products Company was established, and he worked in that department from 1965 until March 1982, at which time he transferred to the Computer Department of the Home Office of Firestone where he is still presently employed.

Mr. Kuntz testified that the Steel Products Company has been the only division of Firestone which has manufactured and sold multi-piece truck rims and component parts. Any Firestone 20-by-8 type "R" ring made in the United States in August of 1941 would have been manufactured and sold by the Steel Products Company.

While he was employed in the Data Processing Department of the Steel Products Company, Mr. Kuntz worked on the computerization of data relating to the sale of multi-piece truck rims by the Steel Products Company. This work began in 1965 when Firestone started to build its customer product data base. At that time, Mr. Kuntz was familiar with the procedures for the receipt of orders and sales by the Steel Products Company, and he personally approved those procedures.

Mr. Kuntz described in detail the procedures used by the Steel Products Company in preparing its computer data information relating to the ordering and sale of multi-piece truck rims during the years 1965 through 1982. Until 1969, the sales dates were maintained on monthly tapes which were retained for approximately five to six months. At the outset of its fiscal year beginning November 1, 1969, the Steel Products Company started accumulating annual sales data on tapes for each year. During the years 1969 through 1982, Kuntz personally observed the procedures followed in preparing such computer records at Firestone's facilities in Akron, Ohio, and Wyandotte, Michigan. He in fact developed the computer program for the accumulated annual sales data. Wyandotte was the only plant of the Steel Products Company making and shipping truck rims made in the United States of America from 1969 to 1982, and during those years all sales of truck rims and rings for multi-piece truck wheel assemblies were required to be reported and computerized in keeping with the procedures described by Mr. Kuntz.

Mr. Kuntz testified that "SR18R" has been the catalog number used in the computer data by Firestone to designate the sale of a 20-by-8 "R" type truck side ring made in the United States by the Steel Products Company, and the numerical products codes 1391 or 1392 have been used to designate whether the ring is oiled or painted. The product code number is used to store the data in the computer. A printout of the data would show the catalog number, SR18R, and a description of the product. This program described by Kuntz was maintained during the entire time that he was in the Data Processing Department of the Steel Products Company, and there was never any final stored information generated by that computerized system which was erroneous.

Kuntz identified Firestone's Exhibit 4 which was admitted into evidence. Exhibit 4 is a computer printout which Mr. Kuntz caused to be made listing all miscellaneous rings, side rings, and lock rings shipped by Firestone for each year from November 1, 1969 through October 31, 1982. That exhibit shows all sales and shipments of rings involved in multi-piece truck rim assemblies during that time period by Firestone. An examination of that document shows no sales of any part identified by catalog number SR18R.

Kuntz then identified Firestone's Exhibit 3 which was also admitted into evidence. Exhibit 3 is another computer printout which Mr. Kuntz caused to be made showing that the same sales data reflect no sales of the two product code numbers 1391 and 1392, oiled or painted "R" type side rings.

■ The terms "user or consumer" are defined by the relevant statute to include "a purchaser." Ind.Code § 33–1–1.5–2. Therefore, wholesale distributors and original equipment manufacturers are users and consumers for purposes of the statute.

Plaintiff's counsel questioned Mr. Kuntz concerning the scrapping of rings in inventory as follows:

Q. And so those, when they are scrapped out, could be sold for scrap or whatever without appearing on your computer printout of original vehicle equipment and distributor sales?

A. It is my understanding they couldn't go for scrap unless they were mutilated.

＊　　＊　　＊　　＊　　＊　　＊

Q. If they are sold out for scrap from the Wyandotte Plant, they wouldn't appear on your computer list which is Exhibit 4?

A. Not if they are scrapped.

(Tr. at 26–27).

Plaintiff's counsel then introduced into evidence plaintiff's Exhibit 11 which was identified as a document bearing the date of December 18, 1975, produced by Firestone as an engineering record in the "national discovery of which this case was a part" purporting to be written by S.W. Blate, an engineer employed in the Steel Products Company. Plaintiff's counsel then read the following paragraph contained in plaintiff's Exhibit 11 to the witness:

When preparing for the Debler case, which involved a similar size and type of product, tried in California last year, I tried to obtain some lock rings which we had scrapped from the Wyandotte Plant

inventory in 1970–1972. The party we sold them to claimed that all type "R" side rings they purchased from Firestone are back in highway service and were in premium demand due to our strike.

Upon questioning by plaintiff's counsel, Mr. Kuntz said that he did not know whether the Wyandotte Plant was scrapping "R" rings in the period from 1970 to 1972. When asked whether Firestone had any invoice or record of the sale of the so-called "scrapped rings" to purchasers who then placed them in highway service, Mr. Kuntz responded:

If we sold it to a distributor, we would have it. If we sold it to a scrap dealer as scrap, they should have been mutilated first, and the answer is "No".

(Tr. at 31.) Upon further questioning by plaintiff's counsel, Mr. Kuntz said that he did not know why the so-called sale of "scrapped rings" referenced in plaintiff's Exhibit 11 did not appear on the computer sales list in Firestone's Exhibit 4. He further stated that he did not know of any other sales which might not appear on Firestone's Exhibit 4, and when asked whether it was possible that there were any such sales which would not be so reported, he responded: "As far as I know, all the sales were recorded." (Tr. at 31–32.)

Kuntz further stated that the sale of parts to a scrap dealer in usable condition would have been recorded on the computer printout identified as Firestone's Exhibit 4, whereas if scrap was sold in a mutilated condition, that sale would not have appeared on the computer printout. Kuntz thus testified that Firestone's Exhibit 4 shows all sales of Firestone side rings in usable condition during the period of time covered by Firestone's computer data information.

Firestone called Robert Lee who has been employed by the Steel Products Company since 1952. He became Chief Engineer of that division in 1972 and worked in that area until 1976 when he became Manager of Technical Services where he now works as a technical expert in product liability matters. During the course of his

employment he familiarized himself with production procedures used by the Steel Products Company in the manufacture of multi-piece rims assemblies, and he has visited and observed the various plant locations of the Steel Products Company. He has also familiarized himself with the written history of procedures relating to the design, manufacture and sale of multi-piece rims by the Steel Products Company, and he is familiar with old catalogs and engineering drawings and product prints predating the time when he became employed at the Steel Products Company.

Since 1952, the Steel Products Company has been the only division of Firestone which manufactured and sold multi-piece truck rims including bases and rings. During the period 1941 to 1982, such products were manufactured at Firestone's plants in Akron, Ohio, and Wyandotte, Michigan. The Akron plant shut down in 1962 and ceased to be a manufacturing plant.

Mr. Lee examined the products alleged to be involved in this case. In describing the markings which he found on the products, he stated that the side and lock ring which are riveted together are marked as a Firestone 20–by–8 "R" side ring made in the United States, and the numbers "8–41" identify the ring as manufactured in August of 1941. He also examined a rim base which was manufactured by a different company other than Firestone.

Mr. Lee stated that the designation "R" appearing on the ring allegedly involved in this action indicates its type and the type of rim associated with the ring. SR18R is the catalog number which has always been used by Firestone to identify a 20–by–8 "R" type side ring made in the United States. Lee confirmed the accuracy of the testimony of Mr. Kuntz concerning the procedures followed by Firestone in receiving orders for multi-piece truck rims, rim bases, and rings, and how those orders were filled and shipped. He also examined Firestone's Exhibit 4 and did not find any indication of any sale of a Firestone 20–by–8 "R" type side ring made in the United States in that exhibit.

In describing the categories of customers to which Firestone sold multi-piece truck rims during his employment with Firestone, Lee stated that the vast majority of such products are sole to original equipment manufacturers, such as General Motors, Mack Truck, and large trailer manufacturers. A small quantity would have been sold to independent distributors who handle automotive parts for servicing the so-called "after-market", and some rings would also go to wheel manufacturers. During the time he was employed by the Steel Products Company, rims and rings were manufactured upon receipt of orders from those customers. Based on his knowledge and experience, the most common items so manufactured have been delivered generally within a week or two from the date of actual production, and slower moving items have been delivered generally within a month.

The 20–by–8 "R" type side ring was first designed and manufactured by the Steel Products Company in the early 1930s. The last time the Steel Products Company manufactured and produced "R" type side rings was in the mid-1950s.

Since he was employed by Firestone in 1952, Mr. Lee never observed any 20–by–8 "R" type side rings manufactured in 1942 kept at any Firestone plant or facility. Based on all of his knowledge and experience, the "R" type side ring involved in this case would have been sold and delivered to a purchaser very shortly after it was manufactured, i.e., in 1942. He never saw any parts that old when he first came to work with Firestone. He knew of no way that an "R" type side ring manufactured in 1941 could have been stored at any Firestone facility since 1952, when he came to work for the Steel Products Company.

Lee also stated that he did see "R" rings stored at Firestone plants when he first came to Firestone in the early 1950s, but he did not remember seeing any such rings stored at Firestone plants in the early 1970s. Upon further questioning, he stated that he could not swear that he examined all the inventory at the Wyandotte

plant in the 1970–1972 period. However, he also stated:

> But I made weekly or bi-weekly trips to Wyandotte from 1968 onward and would tour the facility because part of my job responsibility was for the overall condition of the plant. And I would travel or walk all around that plant. And I don't ever remember in that period of time seeing "R" type rings.

(Tr. at 48–49.)

When asked whether he was familiar with plaintiff's Exhibit 11, Lee stated that he had seen it only in terms of this litigation. The transcript reveals the following at page 51:

> Q. All right. It is possible Mr. Blake is right, that "R" rings were scrapped in—in the early Seventies even though you didn't happen to notice any in the plant?
>
> A. That is possible.

If there were in fact any "R" type side rings in the inventory of the Wyandotte plant in 1970, all of the evidence adduced at the hearing showed that a ring manufactured in 1941 would not have been included in such inventory. In his cross examination of Lee as well as Kuntz, plaintiff avoided the fact that the "R" type side ring involved in this action was manufactured in August of 1941, and he failed to controvert the facts established by the affidavit of Walter Bulgrin which Firestone introduced into evidence as its Exhibit 5.

### B.

Mr. Bulgrin was employed by Firestone in the Steel Products Company from 1924 until he retired in 1972. During his employment he held such positions as Senior Staff Engineer, Manager of Design and Drafting, and Chief Engineer. In all the years of his employment, all Firestone truck rim bases and side rings were manufactured and sold only by the Steel Products Company.

The principal plant and offices of the Steel Products Company during his employment were located in Akron, Ohio. In 1938 Firestone constructed a second plant for the manufacture and sale of truck rim bases and side rings in Wyandotte, Michigan. He worked on the design and setup of that plant and its production facilities. In the years 1938 through 1941, Steel Products Company thus had two plants at which truck rim bases and side rings were manufactured, one in Akron and the other in Wyandotte. In those years, all truck rim bases and side rings produced by Firestone would have been manufactured at those two plants and sold and shipped to customers from those two plants.

During the year 1941, Bulgrin was a staff engineer with Steel Products Company, and his duties included responsibilities for increasing production capacity and participation in management's planning of production and manufacturing for both the Akron and Wyandotte plants. In 1941 he traveled to and met with customers of Steel Products Company, and he frequently traveled to and worked in the Wyandotte plant. In 1941 the truck rim bases and side rings produced by Steel Products Company were manufactured, sold, and delivered to customers who were wheel manufacturers such as Motor Wheel Company, and all major truck manufacturers, including General Motors, Ford Motor Company, White Truck Company, Mack Trucks, Inc., and International Harvester Company. Steel Products Company also sold and delivered truck rim bases and side rings to independent distributors who were not affiliated with Firestone.

In 1941, as was the case in the years prior to and after 1941, Steel Products Company only manufactured truck rim bases and side rings in response to purchase orders received from its customers. In the entire year 1941 there was a tremendous demand for truck rim bases and side rings, and those products were sold and delivered to customers by Steel Products Company as fast as it could manufacture them. This demand persisted in the years 1942 through 1946 because of the military requirements created by World War II.

In 1941, Steel Products Company stamped all of the rim bases and side rings

which it manufactured with the month and year of manufacture. The numbers "8–41" stamped on a Firestone side ring mean that the ring was manufactured in August of 1941. Based on all of his personal knowledge, Mr. Bulgrin stated that a Firestone side ring manufactured in August of 1941 would have been sold and delivered to one of the customers described above within two weeks to two months after it was manufactured.

Mr. Bulgrin's affidavit was filed in this action on May 19, 1983. Plaintiff made no effort to challenge or contradict the contents thereof.

### C.

Plaintiff called as his only witness Donald Gibson, a mechanical and metallurgical engineer. He has been involved in "a number of cases" over the last ten years involving the phenomenon of multi-piece truck rim explosive disassembly, and he has examined the products involved in this action.

When asked whether he has gained knowledge on the subject of comparative wear and use of rims that he has seen that have been in service, he stated that he has looked at about sixty-five of them involved in accidents and thus has "some background in that area." When asked to give his opinion with respect to the physical appearance from a standpoint of wear and use of the products involved in this action, he stated:

> The components are in very good shape, I think. They do not show severe corrosion. I can see no evidence of severe wear in any of the latching surfaces. The units would be categorized as in good shape from that standpoint.

(Tr. at 64.) Plaintiff's counsel then inquired about the rim base involved in this action.

Q. Tell me whether this rim base in your opinion has been—was continuously in service for those thirty years.

A. That rim doesn't look to me like it has had that period of service.

(Tr. 64–65.)

The statute is not predicated in any manner upon the actual service, use, or wear of a product. The cut-off period of the statute begins to run from the date of delivery of the product to the initial user or consumer, including a purchaser, and not from the date when the product is put into actual service or use. Actual service or use of a product as indicated by its "wear and tear" does not necessarily establish the date of delivery of the product.

Plaintiff's counsel next questioned Dr. Gibson as follows:

Q. Dr. Gibson, tell me about your personal experience with respect to acquisition of rims that are—their date stamps of more than ten years prior to the time of your purchase or acquisition.

A. Well, I have only purchased one brand new with a stamp over that length of time, and it was twenty-five years old, approximately at the time of my purchase. And I did purchase it over the counter new. It had not been used. I purchased it from Midway Ford in Kansas City.

Q. When?

A. That was purchased in 1980, I believe.

Q. Who was the manufacturer stamped on that rim?

A. That was a Firestone rim. It was an RH5 and ring, incidentally.

(Tr. at 66–67.) It is revealing to compare Gibson's testimony with his affidavit attached to plaintiff's memorandum filed in this action on May 26, 1983, in opposition to Firestone's motion. In paragraph five of that affidavit, he stated:

> In June, 1982, pursuant to my continuing study of these rims, I purchased a new, 20-inch, multi-piece rim manufactured by Firestone in 1965, from a Kansas City, Missouri Ford truck dealership."

That sworn statement thus indicates that he purchased the RH5 rim in 1982 and not 1980 as he testified, and the rim in fact was 17 years old and not 25 years old as he testified. Gibson also admitted in cross examination that RH5 rim assembly is an entirely different product than the "R" type side ring manufactured in 1941 involved in this action. The singular purchase of an entirely different product manufactured in 1965 thus has no relevance or materiality to the "R" side ring involved in this action which was manufactured in 1941.

Plaintiff's counsel next questioned Dr. Gibson as follows:

Q. Dr. Gibson, have you had any experience with respect to rims, multi-piece rims, in new condition which were date-stamped years ago, back in the Forties, like these parts here?

A. Yes.

       *     *     *     *     *     *

Q. What was the date-stamp of the rim you so inspected?

       *     *     *     *     *     *

Q. All right, Dr. Gibson, did you answer the question?

A. Well, I didn't get a chance, but it was a 1940 rim.

(Tr. at 68–70.) Plaintiff's counsel next asked Gibson to describe the condition of that rim, and the Court sustained Firestone's objection on the ground that this whole line of testimony is irrelevant. As Gibson admitted during cross examination, the product which he was describing was not a Firestone product.

Plaintiff's counsel next questioned Gibson as follows:

Q. Do you have any experience with respect to whether rims that are obsolete as opposed to ones that are currently produced in the original vehicle equipment market are more likely to be found brand new in inventory with date-stamps older than ten years?

       *     *     *     *     *     *

A. The rim which I previously mentioned which I purchased was, quote, 'obsolete.' And this was a product which was left in the stock room or store room which apparently had not moved until I purchased it.

Gibson then stated that the Firestone "R" side ring involved in this action was "obsolete" as of 1978.

Gibson was again referring to the single instance when he purchased a 1965 RH5 rim in 1982. Any such instance provides no evidentiary basis to support any opinion with respect to what might be more likely than not, and for that matter, Gibson in fact did not venture any opinion that anything was "more likely" than not in responding to such questioning. Moreover, since plaintiff has not even attempted to demonstrate when any "ultimate user or consumer" purchased the Firestone "R" side ring involved in this action, there is no evidence to suggest that the "R" ring was obsolete when it was purchased by any such "ultimate user or consumer." This testimony therefore adds no substance to Gibson's initial testimony concerning his singular purchase, and for all of the reasons previously given, this testimony is irrelevant and immaterial, offering no probative value with respect to this action.

As noted above, Gibson admitted that the rim date-stamped 1940 which he referenced in his direct examination was not a Firestone product. He also admitted that he never worked in a Firestone plant or for the Steel Products Company and knew nothing about the manufacturing or marketing process as a matter of first-hand knowledge from internal workings.

With respect to the RH5 product which he purchased from Midway Ford, Gibson testified:

Q. And that RH5 degree product has nothing to do or is not the same product as the 'R' ring that is involved in this case; is it?

A. That is correct.

Q. Entirely different design?

A. It is a different design.

Q. You purchased it from Midway Ford, and I take it that was a Ford dealer?

A. Yes.

Q. Based on what you know about things, Midway Ford had to purchase it from somebody else; didn't they?

A. It would have been purchased from someone else, but I do not know who.

(Tr. at 73–74.)

Gibson admitted that he could not say when the "R" side ring involved in this action was in fact put into service or how long it was in service:

Q. The fact it is in very good shape does not mean it was not in service for thirty years. That is so; isn't it?

A. There is no way I can tell you precisely when that ring went in service, only what it looks like by virtue of its appearance.

Q. Thank you for that honest answer. As a matter of fact, the appearance of the rim or ring on a multi-piece truck rim assembly of this kind will be determined by the amount of hard use it may get, wear and tear, exposure to the elements, and all kinds of similar factors? That is a fact; isn't it?

A. Yes, that is true.

Q. And, therefore, you are not really able to tell this Court with any degree of certainty how many years of service are connected with this particular rim, the Cleve Weld rim and the Firestone ring; are you?

A. I can't tell you a year service date.

Q. As a matter of fact, it may have been in service for twenty years; isn't that so?

A. I would say it had awfully good care if it were in service for twenty years.

Q. But that is a possibility?

A. That is a possibility.

Q. It could have been in service for fifteen years?

A. Yes.

Q. Or twenty years?

A. Or five.

Q. Thank you. The fact is you just don't know?

A. There is no way you can tell when that ring went in service.

(Tr. at 74–76.) Gibson's opinion with respect to the appearance of the "R" side ring involved in this action was irrelevant and immaterial to the issue now before this court. The above quoted testimony also demonstrates that his opinion given on direct examination is entirely speculative and of no probative value whatsoever.

■ The only other evidence introduced by plaintiff at the hearing was plaintiff's Exhibit 14 which was a three page letter from General Counsel and Vice-President John F. Floberg to the National Highway Traffic Safety Administration produced by Firestone in the national discovery relating to this action. In arguing the relevancy of this exhibit, plaintiff's counsel merely pointed to "the statement at the top of the second page" which presumably is the following sentence marked in the margin of the exhibit:

Firestone has never phased-out an original equipment rim design without supporting after-market replacement requirements of side rings abused or damaged in use.

This exhibit is dated February 9, 1973, and relates to RH5 multi-piece truck rim assemblies which, as admitted by Gibson in his testimony, are entirely different from the "R" side ring involved in this action. The "R" side ring involved in this case was manufactured in August, 1941, and Lee testified that Firestone continued to manufacture "R" type side rings into the early to mid-1950s. "R" type wide rings obviously were not being phased-out in 1941, and there is simply no evidentiary basis to suggest that any such "R" side rings manufactured in 1941 were ever used to support after-market replacement requirements in connection with any phase-out of "R" type side rings.

### D.

■ In an attempt to avoid the application of the statute and the consequent dismissal of this action, plaintiff relies upon various broad allegations asserting that the defendants conspired to condone and participate in the continued manufacture and sale of multi-piece rims and that the defendants fraudulently concealed the dangers of their products and should therefore be estopped from invoking the provisions of the statute. At the hearing held before this court on July 8, 1983, plaintiff did not attempt to present any evidence supporting any of those allegations.

Plaintiff advanced his "conspiracy" arguments only in his memorandum opposing the motion of the Budd Company for summary judgment. In describing his theory at page 6 of his memorandum filed herein on April 4, 1983, plaintiff conceded that the gist of any action for conspiracy under the law of Indiana is not the conspiracy itself, but the underlying tort committed against the plaintiff and the injuries resultant therefrom. In that connection, plaintiff stated at page 6 of his memorandum:

> Here, the underlying tort is the explosive separation of a rim and ring assembly manufactured by Defendant Firestone and Cleveland Welding Company, predecessor to AMF Corporation and Defendant Budd, causing Plaintiff, Peter Bishop, severe and permanent injury. Budd's responsibility for these damages arises from its conspiracy with Firestone and the rest of the rim manufacturing industry to continue manufacturing and selling multi-piece rims which it knew to be defective and unreasonably dangerous."

The underlying tort identified by plaintiff above is nothing more or less than strict liability and negligence. Plaintiff's claims for strict liability and negligence in this action, however, are barred and not actionable by reason of the statute. The Indiana authorities cited by plaintiff hold that there is no independent cause of action for conspiracy itself, and the Indiana authorities cited by Budd at page 15 of its reply brief filed herein on May 12, 1983, hold that there can be no recovery for an alleged conspiracy if the underlying act itself is not actionable. Since plaintiff's claims for strict liability and negligence are not actionable, it follows that plaintiff cannot recover for any alleged conspiracy in this action.

Because the Indiana authorities cited by plaintiff hold that there is no independent cause of action for conspiracy, it would furthermore be entirely inconsistent with the intent of the Statute as interpreted by the Indiana courts to allow a plaintiff to assert a cause of action based on strict liability or negligence against manufacturers under the label of conspiracy when any such cause of action has been barred by the Statute. In *Dague v. Piper Aircraft Corporation*, Ind., 418 N.E.2d 207 (1981), the plaintiff contended that the defendant manufacturer had a continuing duty to warn users of those dangerous features of its product *of which it had knowledge* and that the statute did not bar her claims based upon that continuing duty. In rejecting that contention, the Indiana Supreme Court said:

> The Product Liability Act expressly applies to all product liability actions sounding in tort, including those based upon the theory of negligence, and the legislature clearly intended that *no* cause of action would exist on any such product liability theory after ten years.

418 N.E.2d at 212 (original emphasis). Moreover, the United States District Court for the Southern District of Indiana in *Catlette v. McDonnell Douglas Corporation*, (S.D.Ind.1982), 1982 Prod.Liab.Rep. (CCH), § 9204, held that the all-inclusiveness of the Indiana Product Liability Act barred plaintiffs' claims against the defendant manufacturer for "willful and wanton misconduct." Plaintiff's broad allegations asserting that the defendants failed to give any warnings or take any remedial action with respect to the alleged defects in the products involved in this action are necessarily predicated upon a continuing duty to give warnings or take

remedial action. *Dague* and *Catlette* clearly establish that any such allegations, whether couched in terms of a conspiracy or otherwise, are subject to the statute, and plaintiff has failed to address these holdings.

At the hearing held on July 8, 1983, plaintiff failed to offer any exhibits into evidence supporting any such theory of conspiracy. Although plaintiff claims that the conspiracy was one to continue the manufacture of multi-piece wheels, his memorandum and exhibits clearly show that the basis of his theory is that there was a conspiracy to withhold information regarding a different type of multi-piece wheel from certain governmental authorities. Those same allegations based on those exact exhibits have already been stricken from this action and from all other actions involved in the multi-district litigation proceedings. There is thus no basis in fact or law to support the allegations of "conspiracy" in this action.

In support of its civil conspiracy theory the plaintiff cites and relies on *Indianapolis Horse Patrol, Inc. v. Ward*, 247 Ind. 519, 217 N.E.2d 626 (1966). Despite herculean efforts of a superb advocate the plaintiff in that case did not prevail. Neither the reasoning nor the result in that case supports the plaintiff here.

Given the exclusive nature of the statutory remedies created in the Indiana Product Liability Act, the plaintiff's reliance on *bottoms v. B & M Coal Corp.*, Ind.App., 405 N.E.2d 82 (1980), and *Lake Mortgage Company, Inc. v. Federal National Mtg. Assoc.*, 159 Ind.App. 605, 308 N.E.2d 739 (1974), is misplaced. Neither support a conspiracy here.

### E.

■ Plaintiff advanced his fraudulent concealment argument only in his memorandum filed herein on May 26, 1983, opposing Firestone's motion. Plaintiff did not refer to any specific allegations of fraud against Firestone. He merely stated at page 6 of his memorandum that he has alleged "several instances of fraud and misrepresentation against defendants which have ultimately led to the concealment of the dangers of multi-piece rims in general, and the subject rim and ring in particular." He did not attach any exhibits to his memorandum supporting any alleged fraudulent concealment, and he made no effort to introduce any such evidence at the July 8, 1983 hearing. This court has very recently had the opportunity to examine the doctrine of fraudulent concealment under the substantive law of Indiana. See, *Tolen v. A.H. Robins Co. Inc.*, 570 F.Supp. 1146 (N.D.Ind.1983). There is no basis in fact or law to support the application of the doctrine of fraudulent concealment to this action.

Firestone has presented evidence conclusively establishing that the "R" side ring allegedly involved in this action was delivered to the initial user or consumer more than ten years prior to the date this action was commenced. The subject ring was sold and delivered to a purchaser almost forty years prior to the commencement of this action on July 17, 1980. Plaintiff has failed to come forward with any material evidence contradicting Firestone's evidence. Plaintiff has chosen to rest upon the testimony of his expert witness, documents which he obtained in extensive national discovery in the multi-district litigation proceedings, and the allegations contained in his complaint. Plaintiff's evidence, however, is not relevant and does not support its contentions. Plaintiff has failed to come forward with any evidence showing that there is any genuine issue relating to the delivery of the "R" side ring involved in this action to its initial user or consumer.

Defendant Firestone is therefore entitled to summary judgment as a matter of law. Such judgment shall enter. Costs assessed against the plaintiff.